BARNETTE, Judge.
This is a suit for recovery of $5,477, being the amount due on account of the nonpayment of a draft given in payment for a Cadillac automobile allegedly sold by plaintiff, Pontchartrain Motor Company, Inc., to defendants Ripoll Robert and Mrs. Mary C. Robert.
The draft in question was drawn on United Benefit Fire Insurance Company by its claims adjuster in settlement of a claim of its insured Ripoll Robert resulting from destruction of another Cadillac in hurricane “Betsy.” The total price of the Cadillac was $5,647. Robert gave his personal check for $170 to cover the excess above $5,477. Upon presentation for payment at the home office of United Benefit in Omaha, Nebraska, payment was refused for the alleged reason of “incorrect” amount. United Benefit then was declared insolvent and the draft was never paid. Pontchartrain seeks recovery from Ripoll Robert, the insured, for whose benefit the draft was given and accepted.
The defendants were the owners of a 1965 Cadillac registered in the name of' Mrs. Mary C. Robert. It was severely damaged as a result of partial inundation by water in hurricane “Betsy” in September, 1965. After the water receded, Robert, with some difficulty, got the engine started and drove the automobile to Pontchartrain Motor Company for necessary repairs. Specifically he was told that a new starter was necessary, and since one was not immediately available the car was left at Pontchartrain Motors. Robert then reported the damage to his local insurance agent and made a claim under the comprehensive policy provisions. The claim was referred to James F. Woodward, Jr., branch manager of United Benefit Fire Insurance Company, who assumed responsibility for claim adjustment. Woodward decided that the car was a total loss and began immediately to negotiate for a settlement on that basis.
The damaged car had been bought by Robert from Pontchartrain with financing through National American Bank of New Orleans. The unpaid chattel mortgage balance due at the time of the damage was $3,573.45. The bank therefore was interested in the settlement to the extent of its claim for that amount.
Woodward, without knowledge or prior consent from the insured (Robert), had the automobile removed from Pontchartrain to New Orleans Motor Company we assume for appraisal, but the record is not clear on this point. At any rate Woodward, United Benefit’s claims adjustor, declared the automobile a total loss. The record is silent concerning the ultimate disposition of that automobile.
Woodward then contacted a salesman at Pontchartrain, Noble Fritts, to inquire of the availability of a Cadillac of the same year model and comparable value, with a view to settlement on the basis of a replacement. He found one or more demonstrators or executive cars available. It was explained that a demonstrator or executive car is one which has been used by the sales agency and never “titled out” to a purchaser. They are in fact used in the sense that they are not new, but are not considered “used” cars like those taken in trade in the sale of a new car.
Following instructions of Mr. Woodward, Mr. Robert made contact with Mr. Fritts at Pontchartrain for the purpose of selecting a replacement automobile from those available. He made selection of one which showed a mileage of 2,000 less than his damaged car and priced at $170 above the agreed settlement figure of $5,477. Robert agreed to accept the selected car and pay the $170 difference. Woodward *460 never saw the replacement car. The selection was made by Robert in accordance with Woodward’s direction.
In order to effect a purchase and substitution of a new chattel mortgage on the second Cadillac in the exact amount as unpaid and due the bank on the first Cadillac, the following transactions took place:
Mr. Robert signed the purchase order, “customer’s statement,” chattel mortgage, application for title certificate and all other forms, affidavits and certificates customarily involved in the purchase and financing of a new automobile. The invoice was made showing the automobile “sold to Mr. Ripoll Robert” for $5,647. Payment was recited as $2,073.55 cash and $3,573.45 from National American Bank. All these instruments are dated September 24, 1965.
A draft in the amount of $5,477, bearing the same date with notations indicating the claim number, policy number, the claim loss, and the insured, Ripoll Robert, was drawn by James F. Woodward on United Benefit Fire Insurance Company, Omaha, Nebraska. It was payable to “Pontchartrain Motor Company and The National American Bank.” The draft was endorsed by National American Bank “without recourse” and accepted by Pontchartrain, which gave its check drawn on another bank to National American, also dated September 24, in the amount of $3,573.45, for payment of balance due and cancellation of the chattel mortgage note relating to the first Cadillac. National American then gave its check to Pontchartrain for $3,573.-45, representing the amount financed for Mr. Robert on the second Cadillac for which the new chattel mortgage was given. Mr. Robert gave his check payable to Pontchartrain for $170. The car was delivered to Robert and the transaction was closed, except for the failure of United Benefit to honor the draft upon presentment and its ultimate insolvency.
The plaintiff, Pontchartrain, brought this suit against Mr. and Mrs. Robert seeking payment of the amount represented by the draft given for Ripoll Robert’s benefit and accepted by Pontchartrain in payment of the purchase price of the Cadillac allegedly purchased by Robert. The defendants have denied that they are indebted to Pontchartrain for any amount. Their defense is based on the contention that United Benefit, Robert’s insurer, contracted with Pontchartrain for the purchase of an automobile to “replace” the one destroyed; that it was therefore a contract between them for Robert’s benefit. They contend that Pontchartrain actually sold the car to United Benefit and accepted the draft in payment, which was supplemented by Robert’s check for $170 to make up for the difference in value of the “replacement” Cadillac, and that the purchase order and other papers incident to the transaction were made in Robert’s name as purchaser to avoid the more complicated method of sale and re-transfer since Robert was to be the owner of the new car encumbered with the same chattel mortgage as the one destroyed.
The trial court held:
“Under the facts of this case the Court is of the opinion that the Insurance Company exercised its right to replace the insured car. Further, that the agreement was between the Insurance Company and the Pontchartrain Motor Co., Inc.
“In short, it was a contract between the Insurance Company and Pontchartrain for the benefit of a third party, Ripoll Robert.”
The trial judge cited and relied upon the authority of General Auto Service, Inc. v. Lombard, 151 So.2d 536 (La.App. 4th Cir. 1963), in which this court was presented with a similar factual situation. That case involves a claim for automobile repairs and parts replacement resulting from a theft and- later recovery of the stripped and damaged automobile. Arrangements for repair were made entirely by the insurance adjustor and the insured cooperated by pointing out the specific damage and the parts stolen. Upon completion of the repair the automobile was delivered to the *461 insured. The estimate of loss was given to the insurance adjustor and no copy was given to the insured. The insurance company was billed accordingly but had become insolvent in the meantime and payment was not made. The repairman sought recovery from the insured.
This court on first hearing of that case (128 So.2d 451 [1961]) remanded for the purpose of having the insurance policy introduced in evidence so it could be determined if the policy provisions gave the insurer an option to undertake the repairs itself or if its obligation was merely to reimburse the insured for the cost of repairs. On second hearing this court found that the insurer did have that option under the terms of the policy and therefore had a right to contract for the repairs. The repairman was denied recovery from the insured on the ground that its contract was with the insurance company.
The plaintiff in this case objected to the testimony of defendants’ insurance agent who was allowed over its objection to testify relative to standard provisions in insurance policies which give to the insurer the option of replacement of the insured automobile. It further objected to the introduction in evidence of what purports to be a photo copy of the original policy and identified by the agent, not because it was a photo copy but on the ground that it was not a complete copy. An examination of the policy reveals that a portion of one page is missing, appearing as though the page had been cut off short by a paper cutter or not properly placed in the photo copy machine. We do not, however, attach any significance to this circumstance since the copy appears otherwise to be complete and does contain all pertinent provisions, particularly the following:
“ * * * The limit of the company’s liability for loss shall not exceed either (1) the actual cash value of the automobile * * * or (2) what it would then cost to repair or replace the automobile * * *.
“The company may pay for the loss in money or may repair or replace the automobile or such part thereof, as aforesaid ;j; ‡ i)
There was no explanation why the original policy was not produced, but there is no issue relative to United Benefit’s coverage of the loss. Its agent promptly acknowledged liability. There is evidence, however, that the draft when first presented for payment was returned with a notation attached that the amount was incorrect. Thereafter there was some negotiation for settlement on the basis of $5,200; and the insured changed the proof of loss form by reducing the claim to $5,200, indicating the “actual cash value” of the automobile.
In General Auto Service, Inc. v. Lombard, supra, we said:
“The decision in this case rests on two questions: (1) Did plaintiff make the contract for repairs with defendant’s insurance company or with the defendant himself? (2) If the contract was made with defendant’s insurer, can plaintiff nevertheless recover from defendant for the benefits he received from plaintiff’s labor and materials?
******
“It has been generally held that in situations similar to the present one the court must determine who the parties to a contract are from all the facts and circumstances of the case. * * * In the present case the record amply demonstrates that plaintiff contracted with the insurance adjuster for the repair of defendant’s automobile, and not with the defendant himself. There is thus no contractual relation between the plaintiff and the defendant in this suit.” 151 So. 2d at 538-539.
We must therefore determine if the facts in this case support a like conclusion.
Mr. Fritts, salesman for Pontchartrain, testified that Mr. Woodward, who was a prior acquaintance and customer, called and *462 said he was making settlement of a claim on a Cadillac; that “the client wanted another Cadillac automobile”; and that he, Woodward, inquired if Pontchartrain had any comparable in style and model. Fritts replied that they had a few such cars and Woodward said he would send Mr. Robert to look at them, which he did. Mr. Fritts testified that Woodward did not want to “acquire” the car but that “his client wanted to purchase one.”
Mr. Woodward at another point testified that after the decision was reached that the insured car was a total loss he made the call to Mr. Fritts to get the price on a car of the same style, year model and comparable mileage to establish the value of the lost automobile and that he was not trying to buy an automobile. Woodward testified further:
“Q And what did you, as the adjuster for the United Benefit and Fire Insurance Company, elect to do as a result of the total loss ?
“A Well, we had an alternative that I discussed with the owner of the car, to either help him replace it or we could pay him in cash, by that I mean in the form of a draft.
******
“Q Did you have the authority to replace the automobile, sir?
“A Either replace it, or as you may say, make the funds available to replace the damage.
“Q What course of action did you chose to take?
“A It was quite apparent that Mr. Robert wanted the car replaced.
******
“A In a case of this nature, we make the funds available to the holder, in this particular case, he chose to buy another car.
“Q You didn’t buy him a car?
“A No, sir.”
At any rate, pursuant to Woodward’s direction, Robert did go to Pontchartrain Motor Company and did make selection of another Cadillac. The evidence establishes that Robert was expecting his damaged car to be repaired and that the suggestion of a replacement was initiated by the insurance claims adjustor, Woodward. Defendant Robert testified that Woodward told him to go see Mr. Fritts; that he had “made arrangements” for him to see a car. He agreed with Mr. Fritts to pay the $170 difference and “accepted it.”
A witness, Louis Ducac, friend of Robert, testified that he went with Robert to Pontchartrain to inquire about the damaged Cadillac and learned then that the car was not there and had been moved to New Orleans Motor Company. The two proceeded to New Orleans Motor Company and then to Mr. Woodward’s office where they were informed that the car was a total loss and that he (Woodward) had contacted Mr. Fritts who had a similar car. They then went back to Pontchartrain Motor Company. In general Ducac’s testimony corroborates that of Mr. Robert as to what transpired there. Ducac said there was some reference to a “swap” but Mr. Fritts denied that there was ever any such discussion.
Mr. Robert testified that he did not suggest that the draft be made payable to Pontchartrain and National American Bank. Mr. Fritts acknowledged that it was his suggestion, saying:
“Q Why did you request it?
“A Because we had already agreed on the purchase of the car.
“Q Who is we ?
“A Mr. Robert and myself, and he had already signed the order at that time and I wanted to be sure that we got our equity in our check.”
We think the evidence supports the conclusion that United Benefit, through its representative Woodward, elected to exercise its option to replace the destroyed automobile. This decision was made without *463 consulting the insured. However, there is nothing to justify a conclusion that the payment of the agreed amount would not have been made direct to Mr. Robert if he had so requested. He would then have been at liberty to use the money as he saw fit. He did, however, accept the offer (or suggestion) of replacement. Mr. Woodward and Pontchartrain Motors, rather than Mr. Robert, made all the decisions as to how the transaction would be consummated and Mr. Robert cooperated by following their directions.
When Mr. Robert left the damaged automobile with Pontchartrain for repairs, Pontchartrain assumed the obligations of a depositary. LSA-C.C. arts. 2926, 2937, 38. Its release of the automobile to the insurance adjustor without knowledge or consent of its depositor, Robert, at least calls for an explanation. It is reasonable to assume that Pontchartrain would not have placed itself in such a vulnerable position without reliance on an agreement with the insurance company’s agent.
It is our opinion that the contract was between United Benefit and Pontchartrain Motor Company for defendant’s benefit. Pontchartrain accepted the draft in good faith and parted with title to its automobile on the belief that it would be honored. There is no suggestion of ill practice or misrepresentation. It was Pontchartrain’s agent who suggested that the draft be made payable to Pontchartrain and National American Bank and thus it accepted payment, by means of the draft, from the insurer rather than from Robert, but for Robert’s benefit.
Based on these facts we find no error in the trial court’s opinion and the judgment rendered.
For the foregoing reasons the judgment appealed is affirmed at appellant’s cost.
Affirmed.